## PRENDERGAST *v.* PRENDERGAST.

1. VARIANCE—PLEADING—CLAIMS—RECOVERY AUTHORIZED BY PLEADING—SECUNDUM ALLEGATA ET PROBATA.·

   While recovery can only be had upon proofs bringing plaintiff's claim within the scope of his pleadings, it does not follow that he must prove every allegation and recover in full or not at all; the rule of *secundum allegata et probata* meaning no more than that recovery cannot be had on a claim foreign to or not compassed by the pleadings.

2. SPECIFIC PERFORMANCE — PAROL CONTRACT TO CONVEY LAND — PROOF—EQUITY.
    A parol contract for conveyance of real estate should be clearly established in its essentials by a convincing preponderance of the evidence to warrant a decree for specific performance by a court of equity.

3. SAME—EVIDENCE—SUFFICIENCY.
    On a bill for the specific performance of a contract to convey land by a father to a son in consideration of the son's living at home, working the land, and making a home for the father, executed upon the part of plaintiff, evidence *held*, sufficient to establish an agreement to convey to plaintiff the homestead of 40 acres.

Appeal from Ottawa; Cross, J. Submitted January 24, 1919. (Docket No. 52.) Decided July 17, 1919.

Bill by Edward Prendergast against Richard J. Prendergast and others for the specific performance of a land contract. From a decree dismissing the bill, plaintiff appeals. Modified, and affirmed.

*Jacob Steketee* (*Charles E. Ward*, of counsel), for plaintiff.

*Lillie, Lillie & Lillie*, for defendants.

STEERE, J. The parties to this suit are brothers and sisters, all of or past middle age. Their father, Michael Prendergast, died intestate September 9, 1915, aged about 85 years, at the home of his daughter Minnie Bresnahan, survived by the two sons and two daughters above named. His wife, and their mother, died in 1903. He survived a son Henry who died December 31, 1908, and daughter Etta who died in 1910, both unmarried. At the time of his death Richard, the oldest of his surviving children, was over 53 years of age, and Edward, the youngest, was 37. At the time of his death Michael Prendergast had lived for over 60 years on a 40 acres of land, called "the home

40," in Wright township, Ottawa county, where all his children were born and raised. He also had acquired, and owned, appurtenant to or near his home holding, 60 acres more of improved land, making a farm of 100 acres. This with an incidentally mentioned 40 acres of land some distance away, a lot in the small village of Berlin near by and some personal property, constituted his estate.

In February, 1916, plaintiff filed a bill of complaint against defendants in the circuit court of Ottawa county in chancery to enforce specific performance of an alleged oral contract between him and their father claimed to have been made in April, 1910, when the father was about 80 years of age, stated in the bill of complaint as follows:

"That the said Michael Prendergast thereupon urged your orator not to return to his employment in Milwaukee, but to give up his said employment and to remain with him on his farm and to care for him, and he thereupon offered and agreed with your orator that if your orator would remain on the farm with his said father and aid him in keeping the home intact and to furnish to him such aid as he needed and would care for him during the remainder of his life and operate the said 80-acre home and assist him in such other business matters as he might have, that he would deed and convey the said 80 acres to your orator and give the same to him, reserving a life estate only in the 40 acres formerly known as the homestead, to wit: The southeast quarter of the southeast quarter of section 33, in said township of Wright, and that your orator should also have what personal property there was on the farm, including the household effects. That he should operate said 80-acre farm and out of the income of all the real estate should pay the taxes and other general expenses, support and maintain his father and furnish him such moneys for his own personal use as his father might require, the over-plus to belong to your orator."

All parties to this suit left the old home when young.

The two sons, Richard and Edward, left to strike out for themselves and learn other callings than farming when about 17 years of age. Emma Dolan left home when able to earn her own living, worked and went to school, taught, engaged in the millinery business, married, had lived in Grand Rapids for between 25 and 28 years, and was over 45 years of age when her father died. Minnie Bresnahan, except for a short time while teaching school, lived at home until she was married some 27 years before her father's death, and had since lived near by with her husband, who was a neighboring farmer. Richard, who was over 50 years old when his father died, had lived in Grand Rapids for many years where he had worked up to a responsible position in the wholesale grocery business. The two children who died before their father, Henry and Etta, spent their lives at home with their parents, of whom Henry was the mainstay during his life, working and managing his father's farm of 40 acres and other land which he acquired. He appears to have been industrious and thrifty, to his own advantage and that of his parents. Before his death he owned 40 acres across the highway from the homestead, 20 of which his parents had previously acquired and deeded to him, he purchasing the other 20 acres. He also bought and paid for 20 acres of improved land a mile west of the homestead, had the place well equipped with farming implements and stocked with horses, cattle, hogs, etc. Upon his death all his property was inherited by his father, the mother being then deceased. While the parents and Henry were alive home-coming of absent members of the family was a frequent and welcome event, the home conditions apparently being pleasant and associations between members of the family congenial.

Edward's home-leavings to care for himself in some independent calling were periodical and not perma-

nently successful. His accounts of service in the various kinds of employment which he followed, from one to several months at a time, are punctuated by the recurrent statement that at their termination he went "back home." He first left home to learn the harness making trade in December, 1895, when 17 years of age, going to the village of Berlin where he remained but a short time and then to Grand Rapids. He returned home the following August and so far as disclosed took no further interest in harness making. He thereafter left home from time to time, engaging for comparatively short periods in various callings in different localities, returning home between engagements. He worked one season as a harvest hand and thresher in the grain fields of Minnesota, fired engines at a roundhouse of the Grand Rapids & Indiana Railway for a month, worked for some months at two different times on the Muskegon interurban, his last service being as a motorman, from which position he was soon discharged because he had a wreck; worked for a few months at concrete construction in Hastings in the summer of 1907, went to Wisconsin that fall and worked for a construction company which was building an interurban road until February, 1908, after which he went back home and has since remained there or in that vicinity as a farmer. His periodical absences from home while employed in the various pursuits mentioned aggregate, as testified to by him, about three years. He had accumulated nothing up to the time of the alleged contract with his father in 1910 and testified that he then intended to go to Milwaukee "to my old job, to get a start, settle down, get married." He was then working his father's farm on shares.

While but remotely relevant, the persuasive tenor of the testimony upon that subject is convincing to

the contrary of his claim and counsel's contention that he had "helped him (his father) to accumulate what property he had and had never received any compensation for it." If some of the testimony is to be believed he had been a liability rather than an asset to his parents. He was the youngest child and welcomed home by the old folks whenever he saw fit to return from his periodical home-leavings to engage for himself in some chosen vocation, and welcome to remain home as long as he desired. He went and came as and when he cared to. How steadily or much he worked when home is a matter in dispute.. He testified that he did not feel like tying himself down, and received no regular wages, that his mother was the head of the family and handled the pocket-book, saying "whenever I wanted to go anywhere or wanted clothes, when mother was alive I asked her for money to go to a party or go to play ball. If I needed clothes she gave me money to get clothes." While living at home he always had a horse and buggy of his own, was a devotee of the gun and the rod, fished and hunted around home and went to the north woods deer-hunting in the fall. While living at home in 1906, he rented an 80-acre farm near by for a year and longer at his option. He worked it one year and gave it up to go on one of his trips to start life in other fields of activity.

After his mother's death he stayed at Bresnahan's much of the time when in that neighborhood and when Henry died went to the old home in January, 1909, under an oral agreement to work his father's farm on shares for a year, as he claims, taking a lease of the land Henry had owned, for a year, from the administrator, pending settlement of the estate, which went to his father. This did not prove profitable to him, owing to failure of crops and heavy expenses in the home by reason of his sister's sickness, as he com-

plained, and he contemplated returning to the "old job" in Milwaukee, which he had abandoned some two years before in anticipation, as he presents the project, of getting a start, settling down and getting married, in none of which he had made any headway up to that time beyond courting the girl he subsequently married, on August 20, 1910, in part performance of the contract with his father which this bill is filed to enforce, the claimed proposition of the father which it is contended plaintiff accepted and fulfilled being "if Edward Prendergast will get married and give me a good home I will give him these two forties." The Prendergast family was of the Catholic faith, its members belonging to and attending the St. Mary's Catholic church in Berlin of which Father Henry Maus was then pastor. He officiated as the clergyman at plaintiff's marriage and the testimony is undisputed that he urged and hastened its consummation at the solicitation of Michael Prendergast. The parties in interest were all of his congregation and well known to him. The daughter Etta had recently died, leaving plaintiff and his father as the only remaining members of the family at the old home. During his pastoral calls upon the old gentleman the latter solicited his intervention with plaintiff, who he stated was disposed to leave him for employment elsewhere, to stay at home, attend to the farm, get married and make a home for his father, in which case he should "get the homestead." Believing such a course right and in the interest of all parties, Father Maus acted as an intermediary to that end, urging plaintiff it was his duty and to his interest to comply, with assurances as to what his father had promised and would do.

In this gratuitous service he favorably discussed the matter back and forth with the parties more than once, telling each what the other proposed and promised until the marriage took place, and thereafter made

pastoral calls at the home where he found plaintiff and his wife settled and caring for the farm and household, the father expressing himself, in reply to the pastor's inquiry, as contented and well pleased with the arrangement, saying his own daughter could do no better for him than plaintiff's wife.

Upon hearing in the trial court plaintiff's bill of complaint was dismissed without written opinion or oral intimation of the court's theory of the case or views upon the evidence, so far as the record discloses. This issue is, however, for trial *de novo* in this court upon the law and facts, and this record contains, we think, certain undisputed evidence convincingly tending to show a distinct understanding or agreement between plaintiff and his father for a course of conduct and service by the former founded on a promised consideration. Plaintiff's claim is predicated upon an executed, not executory, contract on his part —a family arrangement between father and son—the father dying before performance on his part, presenting a case of that class in relation to which it is said by Justice CAMPBELL in *Taft* v. *Taft,* 73 Mich. 502:

"Under our statute concerning the acts and declarations of deceased persons, in suits against their estates, a great deal of testimony is shut out which would not be shut out between living parties. Family dealings between father and son must generally be beyond sight and hearing of third persons. Their mutual confidence precludes calling in witnesses, as it precluded here the execution of papers. If enough is shown by witnesses to make out all the elements of a contract, we must assume that much must have existed further which no third party knew."

Here there is an apparently disinterested and truthful witness with personal knowledge of the occasion and circumstances of the arrangement who testifies to elements of a contract between the parties of the nature claimed by plaintiff, though it must be con-

ceded not to the extent claimed. What actually passed between father and son, neither can disclose. One is precluded from testifying to it by death and the other by statute. Plaintiff's proofs wholly fail to sustain the allegations of his bill that by their contract he was to have the personal property on the farm, or that the father reserved a life estate in one of the 40 acres, neither are we impressed that his evidence sustains by a fair preponderance his claim to the 40 acres of land across the highway from his father's homestead, which belonged to Henry up to the time of his death.

Defendants' contention is that no contract is established by a preponderance of evidence, and in any aspect of the case that there is no proof of the contract alleged in plaintiff's pleadings. To this proposition their counsel say, "If there was no such contract *as alleged* in the bill of complaint, then it matters not what was done by the plaintiff after he got married," and contending that the only proof which could be claimed to disclose the elements of a contract is that of Father Maus, urge that his testimony, considered in its most favorable light, does not make out the contract pleaded.

That recovery can only be had upon proofs bringing plaintiff's claim within the scope of his pleadings cannot be questioned; but claiming too much does not necessarily preclude all recovery; it does not follow that he must prove every allegation and recover in full, or not at all. The rule of *secundum allegata et probata,* means no more than that recovery cannot be had on a claim foreign to or not compassed by the pleadings; that recovery, whether in whole or part, must be according to that which is alleged and proved.

It would avail nothing and afford no useful information to follow counsel in their review and arguments over the range of family affairs and conflicting testi-

mony contained in this ample record of over 500 pages. Items of evidence can be picked out and arguments made tending plausibly to sustain the contentions of either side; but a parol contract for conveyance of real estate should be clearly established in its essentials by a convincing preponderance of the evidence to warrant decree for specific performance by a court of equity, and as to all but the homestead 40 acres, we find no occasion to disturb the result reached by the trial court.

The old homestead, or home 40, was distinctive in that it was long so known and designated. It had been the home of Michael Prendergast and his family for 60 years. In all the proof by both sides as to what he asserted or promised or prophesied or denied in relation to his real estate, whether separately referred to or in connection with other land, in whatever form the testimony runs it shows a uniform expression of intent on his part that plaintiff should have the homestead 40, sometimes, as variously testified to, saying that Edward did own it and sometimes that he would get it. Of his six children raised in that home the three defendants in this suit had gone elsewhere early in life and long ago became established in homes of their own. Of the three who stayed with their parents as members of the family for most or all of their lives, with no other home, Henry and Etta were dead and Edward alone remained. He was the youngest child, at home working his father's farm when Etta died. It would seem probable that the father desired to induce him to consummate his prospective marriage, settle down and make a permanent home for both at the old homestead. That plaintiff had other plans for his married life is not disputed. Father Maus had been their pastor for about 12 years, buried their dead and ministered to their spiritual wants. It was not unnatural that Michael should ask his assist-

ance or that he should approve and comply. He had been transferred from that parish to Saginaw between 5 and 6 years before this case was tried and when the controversy arose was visited by plaintiff and his attorney to interview him on the subject. When they made known their mission and proceeded to talk of the case to him he checked them with the statement, as he testified, that he had rather write a letter giving his impressions, saying in part: "Leave me convey just my impressions there, I said excuse me, gentlemen, I turned around to my typewriter and there is the result." The letter is as follows:

"St. Andrew's Church.
"Rev. H. P. Maus, Pastor.
"603 North Hamilton Street, Saginaw, W. S., Mich.
"Feb. 5, 1916.
"To Whom it May Concern:

"On the occasion of the marriage of Edward Prendergast to Elizabeth Burns, I recall distinctly that I urged and expedited the marriage at the request of Michael Prendergast, to afford him a home. While I cannot quote the exact words, it is my distinct recollection that Edward was to have the old homestead for the care of his father. In fact, I was much surprised to learn that the property had not been deeded over to him.

"I am pleased to state that Michael Prendergast repeatedly informed me that Edward and his wife made him a good home and were very kind to him.
"H. P. MAUS,
"Pastor."

Following this interview Richard Prendergast visited Father Maus upon a like mission, who as with the others declined to discuss the subject at length and said to Richard, as the latter testified, "I am surprised that the matter has not been settled, you haven't given the homestead to Edward as agreed by your father."

Called as a witness in the case Father Maus was examined at length and in critical detail. Having been

absent from that locality for several years, and no special reason to charge his mind with the subject, he frankly admitted his inability to remember exact dates, language used in most instances and many details proposed to him by suggestive questions, but his asserted remembrance and testimony were distinct and positive as to an agreement between father and son, in harmony with the letter quoted, to which he added remembered details, relating that in one interview, when he told Michael what Edward was willing to do, the old man said, "Well, Father, he is going to get the homestead here." When asked in one part of his cross-examination, "You don't know what land he referred to?" he answered, "In fairness I can't say." His testimony indicates fairness and cautious sincerity. He knew that he left Berlin in the fall of 1910, that Edward was married during the summer and at once settled with his wife at the old home, where he subsequently visited them and the father; that there had been sickness and death in the family earlier in the year and he had visited there quite frequently; that he had participated as before related in bringing about this agreement and Edward's marriage as a step in its performance, and that his participation began some months—from two or three to five months —before Edward was married. He knew the Prendergast homestead well from the first year he went there, knew they had land elsewhere, and Henry owned some across the road from the homestead, but what their holdings amounted to he did not know; he could not swear the old gentleman ever spoke of the homestead as being 80 acres, although from some source he had believed it comprised an 80, and said in answer to the question,

"You believed?

"*A.* Well, built on my knowledge, the time, evidently it has been incorrect, well, it is a 40 instead of an 80,

so they claim, I don't know anything about it now except what I hear."

He does, however, swear positively and convincingly to the essential elements of a valid contract by Michael for a consideration to give plaintiff the homestead, or the "homestead here," well known to the contracting parties as the "home 40" and that the old man assured him "he was to transfer that property." We are not impressed with the legal force or probative value of testimony relative to Michael's not always consistent remarks on the subject by which it is sought to include the other 40 acres in this contract.

Specific performance will be awarded as to the old homestead 40 acres, and the decree, modified in harmony with this opinion, otherwise affirmed with costs of this court to plaintiff.

BIRD, C. J., and OSTRANDER, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.