MAYES v. CENTRAL TRUST CO.

1. SPECIFIC PERFORMANCE—ORAL CONTRACT TO CONVEY REAL ES-
   TATE—EVIDENCE.

   In suit for specific performance of deceased mother's oral con-
   tract to convey property to plaintiff, one of her children, con-
   tract *held*, proved by evidence showing, among other things,
   that during her lifetime the mother made two attempts to have
   a deed prepared whereby daughter would have the interest of
   a joint grantee, the mother made representations to numerous
   parties that she had given plaintiff the property and that the
   mother was to have a home there and testimony of a son of
   the deceased mother that he had discussed the agreement with
   her after it had been entered into.

2. WITNESSES—MATTERS EQUALLY WITHIN KNOWLEDGE OF DECEASED
   —TESTIMONY OF OBLIGEE'S HUSBAND.

   In daughter's suit against administrator of estate of deceased
   mother and her heirs for specific performance of mother's al-
   leged agreement to convey property to plaintiff, testimony of
   plaintiff's husband *held*, properly admitted since he had no
   such interest as would bar him from testifying as an opposite
   party to matters equally within the knowledge of deceased (3
   Comp. Laws 1929, § 14219).

Appeal from Ingham; Carr (Leland W.), J. Sub-
mitted April 12, 1938. (Docket No. 82, Calendar No.
40,001.) Decided June 6, 1938.

Bill by Lina Mayes against Central Trust Com-
pany, a corporation, as administrator of the estate
of Emma Davenport Morse, deceased, and others for
specific performance of an oral contract to convey
land. Decree for plaintiff. Defendants Central

Trust Company and W. Clyde Davenport appeal. Affirmed.

*Fred L. Warner,* for plaintiff.

*Pierce, Planck & Ramsey,* for defendant Central Trust Co.

*Brake, Davis & Miel,* for defendant W. Clyde Davenport.

MCALLISTER, J.   Plaintiff filed a bill against the administrator of the estate of Emma Davenport Morse, deceased, and her heirs, for specific performance of an oral agreement to convey real estate.

Plaintiff was the daughter of deceased and claims in her bill that during the year 1935 she entered into an agreement with her mother whereby in consideration of plaintiff's care and support of deceased during her lifetime, at such time as deceased should need it, deceased would convey certain real estate to plaintiff and her three children.

In August, 1935, deceased concluded to purchase a home and requested the real estate agency through which she was buying the property to arrange that the deed be made to herself, her daughter, the plaintiff, and her three granddaughters.   The property was being purchased from a trust company and at the time that the deceased gave such instructions to the real estate agency the deed had already been made out to deceased as sole grantee.   The representative of the real estate agency called upon the deceased with the deed and, when she discovered that she was the sole grantee, she refused to accept it. The trust company stated that it could not make the deed out in this way, inasmuch as it would neces-

sitate certain court procedure, but suggested that she instead re-deed it in accordance with her desires. The deed which had been prepared by the trust company was taken to the Crystal bank where deceased did business. Later, another proposed deed was forwarded to the bank in which deceased was named as grantor and plaintiff and her three daughters as grantees. When this deed was presented to deceased, she refused to sign it for the reason that it did not comply with her instructions.

On behalf of the plaintiff, many witnesses testified as to statements made by deceased with reference to the property. She told the real estate agent that she wanted a place with a downstairs bedroom because there were so many children that three bedrooms were not enough. Plaintiff was the mother of 12 children, only three of whom, however, were living at home. Deceased also gave written instructions to the real estate agency by a letter in which she stated that she wanted the deed to run to herself, her daughter, the plaintiff, and her three granddaughters, children of the plaintiff. These instructions further stated that the property was to be the home of the daughter as long as she lived or needed a home. She further requested the agency to secure the house so that her daughter could move in before the deal was completed. When the deed, which had been prepared by the trust company, was shown to deceased, in which she was named grantee, she stated that she would not accept it because she wanted written in the deed that the property was to go to plaintiff and her three children. During the conversations with the real estate agent, plaintiff was present.

The bank cashier at Crystal, who transacted some of plaintiff's business with regard to this property, heard deceased tell the real estate agent that she

would not accept the deed as it was and that she wanted it made jointly with her daughter and granddaughters. Later, when the proposed deed came to the bank in which deceased was named as grantor and plaintiff and her three children as grantees, deceased told the cashier she would arrange it herself among her daughter and grandchildren. Then, when the first deed was again presented to her in which she was named as sole grantee, she accepted it.

Deceased further told the wife of the real estate agent that she had bought the home for her daughter so that when deceased wanted to come there she would have a home; that she could not stay in her home at Crystal in the winter because it was too cold. She had been staying there, but could not do so any more. She told the witness that she had a home with her daughter. Plaintiff's husband testified that at the time deceased was purchasing the property, she told him that she was going to make a joint deed of the property to plaintiff and her three daughters; that she wanted a house with a downstairs bedroom that could be used for her room and that she wanted to make her home with plaintiff's family. She further told him that she was not able to stay alone in her home at Crystal during the winter because she was not capable, physically, of keeping up the fires and looking after herself as she had done in the past. Plaintiff's husband testified that the making of a joint deed by deceased and her making her home with plaintiff's family "was the special condition." During all of this conversation plaintiff was present, and apparently acquiesced.

After plaintiff's family moved to the house, deceased told plaintiff's husband "that it was all fixed up so that Lina would get the property at her death." The occupant of the house before its purchase by

deceased testified that on one occasion deceased told her, in the presence of plaintiff and her husband, that she was buying the house for her daughter, and expected to have one of the downstairs bedrooms; that she could not go up and down stairs very well.

Glenn Davenport, a son of deceased, also testified on plaintiff's behalf that deceased had told him she had bought a place for plaintiff and was going to give it to plaintiff; that deceased was to make her home there as long as she lived, if she wanted to; "that she had 'fixed' it" that she was "to have a home here in the winter time or whenever she wanted it * * * she said that that was the agreement that she was to live there whenever she wanted to * * * I did not question her or nothing of the kind, because I did not think it was anything to me, it was okeh with me, the agreement."

Mr. James Lambert, pastor of a church in Lansing, testified that deceased had told him:

"She said she had given it to Mrs. Morse (Mayes?), her daughter, and that she wanted her to have it and had given it to her because quite a bit of the time she had made her home in Lansing and of course, it was her home while she was here with her, made her home with her daughter and she had given her the home and she further said that she had never been able to do for her daughter as she had for some of the rest of the family, and she wanted her to have it and had given it to her. * * * She said Mrs. Mayes had a big family and had had a hard time in life, and she had never been able to do for her as she had the other children. * * * I know she made her home there after that. She was there during a part of the winter of 1935 and 1936. I could not say all of it. She made the remark to me that there was some objection made because she gave this property to Mrs. Mayes by one of her sons.

* * * She made the remark that he was at least hurt to think that she had not given it to him. * * * She said she had made a deed out to her daughter—that is what she said to me. * * * She said she expected to make her last days with Mrs. Mayes, she expected—she said she had gotten along where she was not capable of taking care of herself all winter alone, and especially in the winter months she expected to make her home with Mrs. Mayes as long as she lived, in her later days.''

The chancellor found that there had been an oral contract entered into by plaintiff and deceased, as alleged.by plaintiff, and that deceased had intended to execute a deed in compliance with its terms and had failed to do so. A decree in favor of plaintiff for specific performance was granted.

Defendant's appeal is based upon the claim that no oral contract was proved; that the testimony of plaintiff's husband was inadmissible; and that the evidence as to the contract was insufficient to sustain the action.

In *Taft* v. *Taft,* 73 Mich. 502, in a suit for specific performance of an oral contract between a son and his deceased father, where it was claimed by defendants that there was no proof of such contract, this court said:

''Without going into the facts at large—and the contest is one of fact almost entirely,—we are satisfied that many years ago Adon Taft prevailed on each complainant to give up his other plans in life, and remain about his father's home, working land, and doing other labor, and rendering other assistance, in his father's interests, with the promise and understanding that at or before his father's death the land in question should be made his. It is certain that before his death Adon Taft attempted to carry

out his engagements, but failed from a legal error in the formalities of its execution. Upon the substantial merits we have no doubt whatever.

"The chief defense relied upon in this court is a variance between the bill and proofs. It is undoubtedly true that some of the elements of the contract are not in the proofs precisely as alleged, and in some circumstances there are considerable variances. But there is not the least ground for doubting that the land was promised, that the deed failed of execution, but was intended to be executed, and that complainant, at his father's instance, devoted most of his life to furthering his father's objects, and working with him or in his interest. Enough appears from independent testimony to prove a perfect case for relief. The variances are circumstantial, and do not change the substantial merits. They are all, so far as significant, such as might, and usually would, be found where all the testimony comes from outside witnesses, and neither party to the contract is allowed to be sworn. Under our statute concerning the acts and declarations of deceased persons, in suits against their estates, a great deal of testimony is shut out which would not be shut out between living parties. Family dealings between father and son must generally be beyond sight and hearing of third persons. Their mutual confidence precludes calling in witnesses, as it precluded here the execution of papers. If enough is shown by witnesses to make out all the elements of a contract, we must assume that much must have existed further which no third party knew."

In a similar situation in *Prendergast* v. *Prendergast,* 206 Mich. 525, 532, this court said:

"Here there is an apparently disinterested and truthful witness with personal knowledge of the occasion and circumstances of the arrangement who testifies to elements of a contract between the par-

ties of the nature claimed by plaintiff, though it must be conceded not to the extent claimed. What actually passed between father and son, neither can disclose. One is precluded from testifying to it by death and the other by statute.''

In *Nickerson* v. *Nickerson,* 209 Mich. 134, it was said:

''Referring to the contention that the contract sued upon is too indefinite and uncertain as to time of performance, it must be said that it is quite as definite as many of those as to which equitable relief has been granted by this court. *Taft* v. *Taft,* 73 Mich. 502; *Brown* v. *Brown,* 163 Mich. 337; *Hogan* v. *Hogan,* 187 Mich. 278; *Friend* v. *Smith,* 191 Mich. 99; *Prendergast* v. *Prendergast,* 206 Mich. 525.

''It is asserted that the contract alleged was not proven and that the declarations of Levi Nickerson indicated testamentary intent only. We are of the opinion that the contrary appears from this record. A fair consideration of the testimony supports the conclusion that Levi agreed to deed the lands in question to John during his lifetime. But if it is assumed that the contract was that he should leave it to him in his will, nevertheless equity would afford relief in case of the breach. *Howe* v. *Benedict,* 176 Mich. 522.''

From the undisputed testimony of the disinterested witnesses that deceased on two occasions attempted to have a deed prepared, giving her daughter the interest of a joint grantee, and represented to numerous parties that she had given plaintiff the property and that she was going to have a home there; from the testimony of the son of deceased that he had discussed the agreement with his mother after it had been entered into; and from a review of the entire evidence and record, we are of opinion

that the oral contract between plaintiff and deceased was fully proved.

On defendant's claim of error that the testimony of plaintiff's husband was improperly admitted, it is sufficient to say that he had no such interest as would bar him from testifying as an opposite party to matters equally within the knowledge of deceased.* *In re Morse's Estate,* 170 Mich. 114; *Hiles* v. *First National Bank at Flint,* 237 Mich. 278.

Decree affirmed, with costs to plaintiff.

WIEST, C. J., and BUTZEL, BUSHNELL, SHARPE, POTTER, CHANDLER, and NORTH, JJ., concurred.