## DUNCAN v. DUNCAN.

1. SPECIFIC PERFORMANCE—PAROL CONTRACT TO CONVEY LAND—PERFORMANCE BY VENDEE.

   A court of equity has power to compel the specific performance of a parol contract to convey land where the contract has been fully performed on the part of the vendee.

2. SAME—PAROL CONTRACT TO CONVEY FARM—EVIDENCE.

   In nephew's suit for specific performance of deceased uncle's alleged agreement to leave farm and personalty to nephew, who was to share equally in profits during uncle's lifetime, in consideration that nephew would leave position as school principal with prospects of advancement to superintendency and move his family to farm and operate it, evidence including uncle's letter to nephew and conversations held between uncle and nephew in presence of others and remarks by uncle to others *held*, sufficient to sustain trial court's finding of existence of such contract.

3. SAME—STATUTE OF FRAUDS—PERFORMANCE OF VENDEE.

Evidence to sustain fact that contract by deceased to leave 360-acre farm and personal property to his nephew in consideration of latter's resignation from position as school principal with prospects of advancement to superintendency, move family from town to farm and operate it during uncle's lifetime on basis of equal sharing of profits, was fully performed by nephew to the satisfaction of deceased *held*, sufficient to take contract out of statute of frauds and entitle nephew to specific performance of deceased's agreement (3 Comp. Laws 1929, §§ 13413, 13415).

4. SAME—PAROL CONTRACTS TO CONVEY LAND—POSSESSION—PAYMENT OF PURCHASE PRICE—MEASURE OF DAMAGES.

Taking possession of property under a parol contract is recognized as a ground for specific performance whereas payment of the purchase price is not, since, in the one case, there is no standard for the estimate of damages when the contract is repudiated, and in the other there is a definite and certain standard.

5. SAME—DISCRETIONARY RELIEF—EQUITY.

It is not a matter of course to decree specific performance; a sound discretion is exercised, and the same must not be arbitrary and capricious, but regulated on judicial grounds; where the terms are certain and definite, the acts of the parties and performance on one side take it out of the statute.

Appeal from Isabella; Hart (Ray), J. Submitted January 6, 1939. (Docket No. 75, Calendar No. 40,272.) Decided March 10, 1939.

Bill by Lionel W. Duncan against John Duncan, Clyde C. Harris, administrator of the estate of James Duncan, deceased, and others, for specific performance of an oral contract to devise a farm. Decree for plaintiff. Defendants appeal. Affirmed.

*F. H. Dodds, James E. Ryan,* and *Donald E. Holbrook,* for plaintiff.

*Robert J. Curry,* for defendants.

SHARPE, J.    Plaintiff filed a bill for specific performance of an oral agreement claimed to have been entered into between James Duncan, the deceased, and himself.

James Duncan during his lifetime was a resident of Clare, Michigan. He owned considerable business property in Clare and also a 360-acre farm in Isabella county, Michigan. His wife died in 1928 and he never remarried, nor did he have any children. At the time of the transaction complained of in this cause, plaintiff was the principal of the high school at Fowlerville, Michigan, and took the principalship with the understanding that in case of any vacancy he would receive the superintendency. Plaintiff is a married man with three children, and in his last year as principal of the high school, drew a salary of $1,600. Deceased, James Duncan, had been renting his farm on shares. He became tired of renting the farm and sharing the responsibilities of its care and management.

For some months prior to March, 1935, he began negotiations with his nephew, Lionel W. Duncan, in regard to plaintiff moving on the farm. These negotiations culminated in a letter written to plaintiff dated January 16, 1935, the principal part of which is as follows:

"It is going to be a great shock for you folkes but in the long run it will be the best. I really feel sorry for the girls. They are going to feel the change most of you all. I wouldn't never think of you going if you wasn't going to get the farm in the end. * * * I hope you have decided to come and I only hope that Dorothy will be contented and happy out there. Frances and Janet will have to come here to school, I suppose."

Following the receipt of the above letter, plaintiff came to the city of Clare, where he met his uncle in Woodward's salesroom on February 5, 1935, and

at this time an agreement was entered into whereby plaintiff was to resign his position as principal of the high school and move his family to the farm. It was also agreed that deceased would furnish the farm; that plaintiff was to do the necessary work on the farm; and that both parties would have an equal share of the profits. Plaintiff moved upon the farm about March 1, 1935, and has remained there ever since.

On April 6, 1937, James Duncan died, and upon the refusal of the administrator of his estate and others heirs to make a conveyance of the farm to plaintiff, the present suit was instituted. The trial court granted plaintiff the relief asked for. Defendants appeal and contend that the claimed contract has not been established by competent evidence; and assuming that the contract has been established, the plaintiff is not entitled to specific performance because (1) the acts and doings of the plaintiff are not acts of part performance sufficient under well-recognized, equitable principles to take the oral contract out of the statute of frauds; (2) the consideration for said contract was inadequate; (3) the obligations under said contract were not mutual and reciprocal; (4) the plaintiff has an adequate remedy at law.

For many years our court has adhered to the rule that a court of equity has the power to compel the specific performance of a parol contract to convey land which contract has been fully performed on the part of the vendee. *Twiss* v. *George,* 33 Mich. 253; *Lamb* v. *Hinman,* 46 Mich. 112; *Taft* v. *Taft,* 73 Mich. 502; *Woodworth* v. *Porter,* 224 Mich. 470; *Salsbury* v. *Sackrider,* 284 Mich. 493; *Mayes* v. *Central Trust Co.,* 284 Mich. 504.

The trial court in its opinion said:

"After hearing the testimony, the court is of the opinion that it shows clearly and convincingly that it

was then and there agreed that in consideration of the plaintiff resigning his position in Fowlerville and moving onto and operating the farm on shares until the death of James Duncan that the farm and personal property would be his."

The above finding of the trial court is supported by the letter hereinbefore mentioned and the testimony of William John Woodward, a witness for the plaintiff, who testified as follows:

"*Q.* Would you state to the court the conversation that was had between Mr. James Duncan and Lionel Duncan on February 5, 1937 [1935?], in your store in your presence and in your son's presence?

"*A.* I will tell you as nearly as I can, word for word. They were talking it over and Jim was talking to Lionel about coming, as he had been for sometime, and he told Lionel that if he would come he would furnish the farm, and half of the stock and implements would be his and he could pay for half if he wanted to, if he needed any money.

"*Q.* If who needed any money?

"*A.* Mr. James Duncan, and if he didn't, at his death the farm and everything that were on it would be his and they spoke about—Lionel spoke of a note, and he said, no, he didn't want a note, that Laurie and I heard, and his word was good with us, and that we would be a witness to the deal.

"*Q.* Did you know at that time what was meant when they referred to the farm?

"*A.* Why, the farm was his farm in Vernon and the stock and implements that was on it, that was specified.

"*Q.* Was there anything said that you recall by Mr. Lionel Duncan?

"*A.* Lionel accepted it. That is the only thing I can remember that he said in particular, that he said, had he better draw up a note. In fact he asked him to draw up a note, which I had done."

Laurie Woodward, a witness for the plaintiff, testified as follows:

"Mr. Duncan talked with me a great many times concerning his farm in Vernon township, Isabella county, Michigan, prior to the time that Lionel Duncan went into possession of the farm. The Gallagher brothers were on the farm prior to 1935. They were there approximately 8 or 9 or 10 years, somewhere in that neighborhood. I had conversations late in 1934, or January of 1935, concerning the farm and its management. Mr. Duncan said that he was tired of renting his farm. He said he was getting at an age that he didn't want the responsibility of the farm. He said, 'My wife and I have always considered on giving this farm, when she was alive, to this boy.' He said, 'First thing to see is if he would like it and I think it would be a good time to get him up here and have him on the farm.' He said, 'Don't you think it is a good idea?' I said, 'I can't see anything wrong about it.' He said, 'He is a man, if he likes farming, is educated, and he should take life serious, and as long as he knows there is anything like that for him to have, that it is to be his, he should take a real interest into it and take the responsibility of it.' This was in January and then on the 5th of February he and Lionel came in there and that is when they had this—

"*Q.* Will you tell the court the conversation that was had between James Duncan and Lionel Duncan in your salesroom at Clare on February 5, 1935?

"*A.* Mr. Duncan sat in one particular large chair in the salesroom, and his nephew sat across from him in a low car seat, and he said, 'You know I always wanted to do this. That farm is one of my choice possessions. It is about the first thing I bought when I was a boy and I kept adding to it.' and he says, 'Now, I want you to take it with all sincerity it is your own, which it will be and let's see if we can't make a real success of it, and make it

pay.' and so they talked over about the stock and Lionel said— he was to get—Duncan was to get—it was to be 50–50 while he lived, and Lionel says to him half—he says—'John—the sale of the stock— he said, 'Well, we better have John draw up a note for that,' and Mr. Duncan says, 'No, your word and my word is good without a note. I wouldn't want to think I was going to give you this place and get that much forever.' He says, 'These boys will be our witnesses if anything isn't right, if we need them.' * * *

"*Q.* Was anything said about what was to be done with that property upon Jim Duncan's death?

"*A.* All to go to Lionel Duncan.

"*Q.* What do you mean by all?

"*A.* The farm and everything on it."

The above conversations were held in the presence of deceased and plaintiff and sustain the finding of the trial judge. Other testimony was offered and accepted which in our opinion is an acknowledgment on the part of deceased of the contract.

Frank Thilly, a witness produced by plaintiff, relates a conversation with deceased:

"He says, 'I got to do something with the farm. I am getting old and I always had tenants on it and I decided if I can get the boy up here and put him on there why it would be his farm after I got through with it.' "

James McKay, another witness, testified as to a conversation with deceased:

"I had another talk with him Friday evening before he was taken sick on Sunday. That conversation was in the Hotel Doherty. We got talking about the farm and I said I had a little trouble getting help this year to take care of my crops, men seemed hard to get, and he said he had gotten away

from all that, that his nephew was taking care of it very satisfactorily, that his job was very satisfactory, and he went on to tell me what he did, what arrangement he made with him. He said they had the implements and stock 50–50 and he said, of course, when he got him to come up there he had to make some kind of arrangements with him to leave his job, that he had a pretty good job and good chance for advancement, and he said he told him he should have the farm when he was through with it.''

It appears to us that the next question to determine is whether or not plaintiff performed his part of the agreement. It is undisputed that plaintiff managed the farm until the death of James Duncan. Several witnesses testified that the management of the farm was entirely satisfactory to deceased.

Defendants contend that the declarations of deceased merely show an intent to give the property to plaintiff; and that the acts of decedent in making the oil and gas lease and his failure to make a deed or will pursuant to the alleged contract are inconsistent with the making or existence of a parol agreement.

We are of the opinion that the claim of defendants, standing alone, would not take the alleged contract out of the statute of frauds (3 Comp. Laws 1929, §§ 13413, 13415 [Stat. Ann. §§ 26.908, 26.910]) but the testimony produced by plaintiff sustains the finding of the trial judge that there was such a contract; and that the same has been fully performed on the part of plaintiff.

In *Denevan* v. *Belter* (syllabus), 232 Mich. 664, we held:

"Where plaintiffs fulfilled every obligation under their oral contract, such part performance was sufficient to take the case out of the statute of frauds, although because of the death of the other party, their services were required for only a few weeks.''

. The acts and doings by plaintiff in moving from Fowlerville to the farm and working the same on shares; the giving up of his position as principal of the high school and his opportunity to become superintendent, denying his children the advantages of city schools, are such acts as would lead a reasonable mind to believe that there was more to the agreement than just working the farm on shares.

In *Lamb* v. *Hinman, supra,* we said:

"The reason why taking possession under an oral contract is recognized as a ground for specific performance, when payment of the purchase price is not, is that in one case there is no standard for the estimate of damages when the contract is repudiated, and in the other there is a standard that is definite and certain. A purchaser who takes possession of land under an oral purchase is likely in so doing to change very considerably — perhaps wholly — the general course of his life as previously planned by him; and if he is evicted on a repudiation of the contract, any estimate of his loss by others must, in many cases, be mere guess work. The rule, therefore, rests upon the element of uncertainty, and not upon any technical ground of exclusiveness in the possession. And upon this point no case on its equities could be plainer than this. Complainant abandoned one home and made a new one in reliance upon the oral contract; occupied the land bargained for and cultivated it for six years in confidence that the contract would be performed; and it is not too much to say that the whole course of his subsequent life was probably changed in consequence. To deny relief under such circumstances for no other reason than that he did not occupy exclusively, would be to make the whole case turn upon a point in itself unimportant as affecting the real equities. The case is within *Kinyon* v. *Young*, 44 Mich. 339."

In *Friend* v. *Smith* (syllabi), 191 Mich. 99, the court held:

"A contract fully performed on the one side, to convey to a daughter and her husband defendant's homestead in consideration that the former would give up their farm, move to the home in the village and occupy it with defendant, and make some improvements named, the deed to be executed when the improvements were completed, is enforceable against the grantor though it was not in writing.

"It is not a matter of course to decree specific performance; a sound discretion is exercised, and the same must not be arbitrary and capricious, but regulated on judicial grounds; where the terms are certain and definite, the acts of the parties and performance on one side take it out of the statute."

The record justifies us in saying that plaintiff established the making of the claimed contract; that the same was performed to the satisfaction of deceased; that in reliance on such agreement, plaintiff and family changed the course of their lives from what it would have been had plaintiff remained in the teaching profession; and that to deny plaintiff equitable relief would not harmonize with the intent and agreement of the parties.

The decree of the trial court is affirmed, with costs to plaintiff.

BUTZEL, C. J., and WIEST, BUSHNELL, POTTER, CHANDLER, and MCALLISTER, JJ., concurred. NORTH, J., took no part in this decision.