BETTERLY *v.* GRANGER.

CONTRACTS—CARE AND KEEP—EVIDENCE.
  Decree granting specific performance of oral contract to leave decedent's entire property to plaintiff, husband of decedent's second cousin, in return for his moving onto the promisor's farm, operating it upwards of 25 years and caring for decedent, is affirmed under evidence presented.

Appeal from Ingham; Ryan (Theodore P.), J. Submitted October 11, 1957. (Docket No. 50, Calendar No. 47,340.) Decided December 24, 1957.

REFERENCES FOR POINTS IN HEADNOTES
49 Am Jur, Statute of Frauds § 5; 57 Am Jur, Wills §§ 166, 192.

Bill by Burl Betterly against Bruce Granger, executor of the estate of Mary Clements Mead, Leo Mead and other beneficiaries under the will of the deceased, to enforce oral agreement of the deceased to leave entire properties to him. Decree for plaintiff. Defendant beneficiaries appeal. Affirmed.

*Sinas, Dramis & Brake (Merle E. Brake,* of counsel), for plaintiff.

*Foster, Foster, Campbell & Lindemer,* for defendants.

SMITH, J. This is another case in which the aid of the chancellor is sought in obtaining specific performance of an alleged oral contract to leave "everything" to the plaintiff, who is here named Burl Betterly. In spite of the alleged promise, when the will was read, it was found that the bulk of the estate had gone to others, Burl receiving only a life estate in the farm. He thereupon brought his bill in chancery for specific performance of the alleged contract. In the Ingham county circuit court he prevailed.

Burl Betterly and his wife, Helen, were married in the year 1921. Helen was a second cousin of the alleged promisor, the then Mrs. Mary Clements. As a child she had often stayed with the Clements, and she felt that she was, among her brothers and sisters, possibly the favorite of the older couple. After Helen's marriage a close relationship continued. She and her husband visited back and forth with the Clements. On one such occasion, in the winter of 1927–1928, Mr. and Mrs. Clements asked the young couple to move onto their farm and operate it. At this time the Clements had a tenant farmer but his time had about expired and "they were looking for someone to come on, some young person that could

come to their home or to their farm and stay and work it, and when they come to the place where they were needing help as they grew older, they would have someone to take care of them, come and stay there and care for them." The substance of this proposal was repeated shortly afterwards. The Clements had gone to the Betterlys early in the day, Mrs. Clements wanting to give the Betterly's 3-month-old baby, Dawn, her morning bath. (It was in Dawn's bedroom, many years later, that Mrs. Clements was to die.) They stayed on for their noon meal and, as they were leaving, the subject was again broached. The Clements were looking forward, they said, to the Betterlys coming to the farm the "·'next year and staying there with us and working the farm and staying there as long as we live and caring for us.' " At this time Mr. Betterly replied that he would "come there the next year."

So, in fact, he did. At this time the Betterlys had made a substantial start in life. Burl was 29 years of age, with a wife and infant daughter. He had been farming for several years, both as tenant and as owner. He owned a 17-acre berry farm of his own, with house and garage. He had farm tools sufficient to work a farm, horses and cattle, and four or five hundred dollars in the bank. He was looking forward to the purchase of his own farm. The Clements, on the other hand, were no longer young. He was in his sixties and his wife slightly younger, 58 or 60. They owned a farm of 119 acres, and were childless. Their need has been described in their own words. The advantage to the Betterlys, if everything worked out, was not insubstantial. At any rate, the Betterlys moved to the Clements farm.

This case departs from the norm at this point. Usually, because of the very nature of these cases involving the family relationship, testimony comes only from the family itself. Here we have, from

time to time, the testimony of neighbors. Such we have at this point with respect to the circumstances under which the Betterlys moved to the Clements farm. Mr. Bert Mastic, whose farm was across the road, testified for plaintiff Betterly. He (Mastic) had had a conversation with Mrs. Clements about the time of the move. She had been to the mailbox, and, being neighborly, had stopped and talked with him.

"*Q.* You tell us, as best you recall, what that conversation was between you and Mary Clements.

"*A.* Well, we passed the time of day and about the weather and such things as people will talk about, and then I brought the subject up about changing the renters. She said, 'Yes, we're going to change renters.'

"*Q.* How did you happen to know that they were changing renters?

"*A.* Because Burl was moving tools on there at that time. *  *  *

"*A.* And she says, 'Yes, we are changing renters. John and I haven't got any children, and we're going to get things fixed up so we know where our property is going when we get done with it,' or words to that effect. I don't know if that is exactly the way she said it or not.

"*Q.* All right. Did she say anything further in regard to what she meant by that? *  *  *

"*A.* She said that Burl is a nice young fellow and Helen is a nice young girl, and as I understand it, I think Helen and Mary were cousins. *  *  *.

"*A.* And she said, 'We have made up our mind if we get them on the farm, that if they take care of the farm, take care of us as long as we lived, that they could have what we got when we got through with it.'"

Initially there seems to have been a period of adjustment, of trial, of mutual feeling-out. With a lifetime relationship involved this would seem neither

unwise nor unusual. But that fall, after the corn had been cut, and while plaintiff was setting up his corn shocks, he was approached by Mr. Clements. Mr. Betterly relates the conversation in these terms:

"John said to me, he said, after we had been visiting, 'What do you think, Burl?' I looked right at him, 'What do you think? What do you mean, John?' 'Why,' he said, 'You know that we said that we would make it worth your while if you would come over and work this farm for us and take care of us.' I said, 'Yes,' and he says, 'Now, do you want to stay?' I said, 'Sure, I want to stay.' Then he says, 'We will go and have the papers fixed up for you.'"

Such, also, was the tenor of a dinner-table conversation between the 2 families at a subsequent date. Mrs. Betterly is testifying:

"As we sat around the dinner table after dinner, why John said to Burl, 'I have talked with you and have asked you if you were satisfied and would like to stay on,' and Burl told him he was, and he said, 'So, we have gone and fixed our papers so when the last one is laid away, what is left that we have will be yours.'

"*Q.* Was there any further conversation?  *  *  *

"*A.* Yes, Burl said, 'Well, John, you have brothers and sisters? How about that?' And John said, 'My brothers have enough of their own, and they have made like situations. They have made like agreements with the men on their farms,' and Mary said, 'People will say, you are here looking after their money, but what do we care? We have to have someone to care for us, and we can help you.'

"*Q.* Did Burl say anything, indicating any assent or refusal of this proposition?

"*A.* Yes, he said that he would stay and look after them as long as they lived.  *  *  *

"*Q.* Helen, you said that they said they would make it worth your while, is that right?

"*A.* Yes.

.: "*Q.* Did they give you any elaboration on that statement?

"*A.* Well, when John was talking to Burl at the dinner table, he said there was, there would be, that they at that time had better than $20,000 besides the property that they owned.

- ."*Q.* Did either of them say anying about the duration of this agreement? In other words, how long they expected you to take care of them?

· "*A.* Yes, John said it might be 20 years but he said, 'Even if it is, you will have more than you would if you farmed it for yourself when we are gone.' "

'The relationship thus crystallized. It continued for many years. Plaintiff worked the farm, without help from Clements. The bonds between the families were close. John Clements and the plaintiff went to "father and son" banquets together, the families went to town together, to the fairs, and to church socials when the Ladies Aid had dinners. When John fell ill, finally, plaintiff and his wife gave what help they could. Helen Betterly stayed with him for a week. "Burl stayed there nights and cared for John nights a lot. The last week of his life he did every night." Mr. Clements died in December, 1934.

Following Mr. Clements' death the relationship of decedent and the Betterlys grew even closer. "She (Mrs. Clements) used to tell Dawn,—she would take her over there and keep her with her, and she would pick her up in her arms and after John died she would pick her up and cry, and say, 'You are all I have got now, you and your daddy.' " There can be no doubt, upon the record before us, not only from the verbal testimony adduced, but from the conduct of the parties, that Mrs. Clements, the widow, wished and agreed, for herself, to carry out the agreement previously existing. Thus the testimony of Dawn Betterly describes the substance of the agreement

allegedly made under the circumstances described and here sued upon:

"I believe my first recollection is shortly after grandpa's death. We were at her house. I was on her lap and she was sitting in her dining room in front of a south window where she kept a chair, and it was her chair as the leather chair had been grandpa's. I remember her saying at that time, 'Well, son, John is gone now and you are what I have left. The agreement that John and I made with you in regards to your looking after us and what we have then is to be yours, I want to renew that agreement with you and say that everything is as John wished. That my will shall be as John's will was.' "

Plaintiff and his family were now called upon to render all manner of services for the widow: they ran errands for her, cared for her during illness, helped her with her car, shoveled snow from the drive, accompanied her to funerals, and on shopping trips, went with her to the doctor and to social affairs, carried water ("she had it [running water] all disconnected to go to Florida and she would never bother to have it connected up again"), and, in general, treated her as one of their own family. Many of these services were performed by plaintiff, others by his wife and even the children (who called her "grandma"), although it was usually the plaintiff who was called whenever she wanted something done. With the forgetfulness not unknown to older people she would occasionally misplace things (*e.g.*, her house keys or car keys, or pocketbook) and call upon plaintiff, even at night, to assist her in finding what she needed. There was in all of this no suggestion of payment, save once, subsequent to her remarriage in 1943. The incident is revealing in the light cast upon the relationship of the parties. Plaintiff had been called upon to help construct a hoghouse. When

it was finished, Mary. asked him what she owed him. for the work. The record continues:

· "They had been talking, and finally grandma said to dad, to the effect that, 'Well, what do I owe you for your work on the hoghouse?' Dad said, 'Well, Mary, I believe we have an agreement by 'which I am to do the work, I am to look after things on the place, and our agreement is then that I will be paid after you are done with your property and with all of it, and therefore, you don't owe me any money,' and dad said, 'Is that the agreement still standing?' She said, 'It certainly does. I do not go back on my word.'   *   *   *

'"*A.* He said, 'Then I shall have my pay later on and you owe me nothing now.'   *   *   *, ...

"*A.* Well, there were many times when she would say to the effect, 'Well, you will be better paid by and by.' Dad would do something and she would say something to the effect, 'How much do I owe you,' and dad would say, 'You don't owe me anything,' and she would say, 'Much obliged until you are better paid.' "

(This, apparently, was a phrase often used, "Much obliged until you are better paid. You will have your pay by and by.")

In the year 1943 the deceased married Earl Mead. (The appellants are his children, who were grown, and at no time lived with the elderly couple.) Mary was then in her seventies. During the balance of Mr. Mead's life (he lived only 3 years after the marriage) the plaintiff was not called upon to do much for Mary as before, though the family relations remained cordial. Mr. Mead died, however, in the early part of 1946. The record is silent as to any succession by Mary as to any part of his estate and upon oral argument we were requested by appellants to strike from their brief a statement that Mary had succeeded to Mr. Mead's estate. She again began to

call upon plaintiff for aid, and, in addition, availed herself, upon occasion, of the assistance of Mr. Orrel Henseleit (the husband of one of Earl Mead's daughters) and a long-time friend and relative by marriage, Mrs. Alma Fowler, in whose home, near Ann Arbor, she stayed during one period after her discharge from the hospital in 1953.

Possibly the most revealing incident of the many in the record concerning the relationship of the parties, their agreement, and their mutual expectations therefrom, occurred shortly after the death of Mr. Mead, at which time Mary was well advanced in years. A rumor had apparently reached the Betterlys that she had executed a will containing provisions at variance with their alleged agreement. According to the record a conference of some formality took place, not only Mr. and Mrs. Betterly attending, but their daughter Dawn, now a young lady of some 20 years, as well as a neighboring farmer. The record continues:

"Q. Did any one go over there with you?

"A. Yes, sir.

"Q. Who?

"A. Ralph Hayner.

"Q. Give us the names of all the people who were present.

"A. Burl Betterly, myself, Dawn Betterly, and Ronald Betterly, and Ralph Hayner and Mary Mead.

"Q. Now, when Burl got there, did he indicate to Mary in any way why he was there? * * *

"A. He said, 'Mary, I understand you have changed your will, is that correct?'

"Q. And what did Mary say, if anything?

"A. She said, 'Yes.'

"Q. Did she go any further? Did she give any further explanation?

"A. Burl said, 'Mary, don't we have an agreement pertaining to your will, to your property? I have stayed here for this property, taken care of you.'

"*Q.* What did she say?

"*A.* She said, 'yes, but what I work and earn I can do as I please with.'

"*Q.* Did Mary Mead work?

"*A.* Some.

"*Q.* Give the court an accurate idea of how much.

"*A.* Well, if there was somebody she knew were ill for a few weeks, she would go into their home, maybe, and be doing things for them, care for them until they were able to be around again.

"*Q.* Did she ever have a regular job such as working in a store, a factory, an office, or anything like that?

"*A.* No, sir."

(The Ralph Hayner, above mentioned, was the neighboring farmer who was asked to join in the meeting. In his testimony, in speaking of the above account of Helen Betterly, he said, "I don't recall anything that would be any different.")

Some 9 years after the death of her second husband, Mary herself died. During her last illness, and after her return from the hospital, Mrs. Betterly assumed her care. "I had to take care of her as a baby, clean her up as you would a baby." Death finally came to her, in Dawn's bedroom in the Betterly's home. It was they who called the funeral director, picked out the casket, made the funeral arrangements, and contacted the minister. Shortly afterwards the will was read. The bulk of the estate, consisting of about $38,000 in personal property, Mary had left to the children of her second husband, Mr. Mead. Burl was given a life estate in the farm he had worked for so many years, as well as the farm personalty. Burl states that he "was shook up some" by this and invoked the aid of the chancellor with respect to the personal property left to the Mead children. (As noted, plaintiff had received a life interest in the farm by virtue of the will and

through a court-approved, pretrial, settlement with his children, had removed the real estate from controversy prior to trial.)   Specific performance was decreed.

There is no necessity for our repeating the general principles applicable to this type of case.   They were discussed by us, in *Applebaum* v. *Wechsler*, 350 Mich 636.   As to the decree before us, it is attacked by appellants upon various theories: that the asserted contract is not certain in its essentials, that any agreement made relates to the farm realty and personalty only, that there are no such compelling equities as would justify the decreed specific performance, and, finally, that all of the testimony of Helen Betterly was incompetent under the so-called "dead man's statute," CL 1948, § 617.65 (Stat Ann § 27.914).   We will discuss the statutory issue first.

The portions of the statute relied upon, material to the issue, are as follows:

"Sec. 65.   When a suit or proceeding is prosecuted or defended by the heirs, assigns, devisees, legatees, or personal representatives of a deceased person, the opposite party, if examined as a witness in his own behalf, shall not be admitted to testify at all to matters which, if true must have been equally within the knowledge of such deceased person."

The appellants contend that Mrs. Betterly comes within the statutory bar upon 2 grounds: first, that she has a direct pecuniary interest in the outcome, and second, that she was "in fact a joint and several party to the alleged agreement."   Her asserted pecuniary interest in the outcome is said to arise from the "enhancement of her husband's estate resulting from the decree" in his favor.   The interest required for disqualification under the statute, however, is a direct monetary interest in the subject matter of the litigation and its outcome.   Thus

(there being no tenancy by the curtesy in this jurisdiction) a husband may testify in support of his wife's claim, *Mayes* v. *Central Trust Co.*, 284 Mich 504, though not the wife for him (in view of her dower interest) where the litigation involves his claim to real estate, *Laird* v. *Laird*, 115 Mich 352. We examined the wife's position under this statute in the case of *Dunn* v. *Dunn's Estate*, 127 Mich 385, 386, wherein we said:

"Upon the trial Anna E. Dunn, the wife of Charles Dunn, was allowed to testify. The principal question in the case is whether she was a competent witness or not. The appellant claims that she was not a competent witness under the statute (CL 1897, § 10212). Counsel assert the case is controlled by *Laird* v. *Laird*, 115 Mich 352. We cannot agree with counsel in this contention. *Laird* v. *Laird* was a case where a bill was filed for the specific performance of an oral land contract. If a decree was rendered as prayed for in the bill, the wife would secure homestead and dower rights, of which she could not be deprived except by her own voluntary act. For these reasons it was held she was a party in interest within both the letter and spirit of the law."

The point does not merit extended discussion. There is, on the facts before us, no disqualification of the wife's testimony under the statute because of direct pecuniary interest.

Nor does such disqualification arise under a theory of joint and several contract. The trial chancellor's conclusion that "The agreement was with Burl Betterly personally and not with him and his wife, Helen Betterly," finds ample support in the record and we are not persuaded that it is in error. We are looking, it will be observed, at an asserted agreement made after the death of Mr. Clements, with his widow, for her care. The con-

versations before us dealing specifically with the agreement asserted refer, without significant exception, to an agreement between Burl and the deceased, not between Burl and Helen and deceased. Thus "I am to do the work, I am to look after things on the place," were the terms employed, and not disputed, at the time of the hoghouse incident above described. Whoever the parties to the agreement with Mr. Clements may have been some 20 years prior hereto (and we are not intimating that there was, even then, a round-robin agreement between the 2 husbands and the 2 wives), it is clear that the trial chancellor's conclusion was correct that the agreement sued upon was made with Burl Betterly, and that the rewards upon its completion, consisting of the entire estate, were to be his and his alone. ("I haven't much longer here," Mary had said to Burl in her last illness, "and then as we said before, everything is to be yours.") *Cf.,* respecting the estate, the dinner table conversation described heretofore with respect to making the move "worth your while": Burl was told "he (John) said there was, there would be, that they at that time had better then $20,000 besides the property that they owned." The fact that Mrs. Betterly rendered services directly to the decedent is true also of the Betterly children, but this circumstance does not turn them all into contracting parties. The duty was Burl's and the responsibilities were his, to be discharged either personally or through the aid of others, depending upon their nature.

What we have before us is a series of acts extending over a long period of years, inexplicable upon any basis other than the agreement claimed. For a quarter of a century Burl Betterly remained on the farm, forsaking all other opportunities for employment. Why? "Because I had an agreement with the Clements to stay on their farm as long as

they were alive." This he did. But the agreement he respected, the appellant Mead children tell us, was not specific in its terms. Just what this means is not clear. It was specific enough to insure to "grandma" the rendition of services with a dedication unusual even in those bound by ties of blood, and the return was specific enough (*i.e.*, "everything") for the chancellor's decree. The Mead children tell us also that the services so rendered were not of an exceptional character, but of a minor nature, having a "readily ascertainable market value" and "which could be procured from any employment agency." Let them reread the facts: We seek a man who, first of all, can and will work a farm with thrift and care. But this is only a part of his duties. He must, with his wife, be available at any hour of the day or night, to render services, upon demand, to his employer, a lady well advanced in years. (For example, they must be willing to leave their home late at night and search until 2 o'clock in the morning for misplaced keys, if their employer is distraught and knows that somebody is "in that bedroom.") The man we seek must be willing to live in, and ask his wife and children to share, a primitive home without inside toilet or running water, for 20 years. At the end of that time, the employment agency is authorized to inform him, he will be permitted to have (cold) running water piped into the house. He must be willing and able to keep himself, and his wife, and raise his children, and educate them, on less than a hundred dollars a month, cash income. Bond or security he will not enjoy. Assurance to him of the bargained-for return for his lifetime of work will rest upon the frailty of a human promise.

We will not, in our quest for this man, canvass, with the appellant children, the employment agencies to which they make ready reference. We will

not search the market for the going price on solace and comfort. We will not scan the current quotations on devotion to duty. *Lex nil facit frustra nil jubet frustra.**

Affirmed. Costs to appellee.

EDWARDS, VOELKER, and BLACK, JJ., concurred with SMITH, J.

DETHMERS, C. J., and SHARPE, KELLY, and CARR, JJ., concurred in the result.

---

* The law does nothing in vain and commands nothing in vain.